UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 NOV 18  PM 4:55

CLERK
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| ANO LOBB | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | Case No. 5:22- Cv -209 |
| Lincoln National Life Insurance Company a.k.a | ) | |
| Lincoln Financial Group | ) | |
| | ) | |
| Defendant | ) | |

**COMPLAINT**

Plaintiff, Ano Lobb (hereafter "Mr. Lobb"), by and through his attorney, Arthur P. Anderson, Esq, hereby complains against Defendant Lincoln National Life Insurance Company a.k.a Lincoln Financial Group (hereafter "Lincoln") as follows:

**PARTIES**

1.      Plaintiff, Ano Lobb, is a resident of the District of Vermont, residing in the town of Bradford, county of Orange, state of Vermont.

2.      Defendant Lincoln is an insurance company doing business in the state of Vermont and issued a short-term disability policy (STD), a long term disability policy (hereafter "Policy"), as well as other employee benefits such as aid premiums on a life insurance policy, to Dartmouth College Health LLC (hereafter "Dartmouth College") which covered Dartmouth College") employees.

3.      Mr. Lobb was an employee of Dartmouth College and was a qualified beneficiary of the policy issued by Lincoln as a Class 2 employee under the policy.

4.      Under Lincoln's policy Mr. Lobb would be entitled to monthly LTD disability benefits, a waiver of premium on Lincoln's group life insurance plan, plan under the retirement plan, if he became disabled under Lincoln's definition of disability.

1

5.     Lincoln's definition of disability is as follows

     1. during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation

        and

     2. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of any occupation

6.     Mr. Lobb has met all eligibility requirements for LTD benefits under the Lincoln policy.

## JURISDICTION

7.     Jurisdiction is based upon the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §1001 *et seq.*

## STANDARD OF REVIEW

8.     This matter should be reviewed *de novo*.

## COUNT ONE

9.     Mr. Lobb was employed at Dartmouth College as an assistant director Online Learning and Innovation beginning on August 1, 2008.

10.     Mr. Lobb's job at Dartmouth College required a high level of functioning which consisted of multitasking and an unimpaired ability to focus and concentrate on details as well as a high level of performance.

11.     Mr. Lobb's annual salary exceeded $120,000.00.

12.     In November 2018, Mr. Lobb suffered a carotid artery dissection.

13.     As a result of Mr. Lobb's carotid artery dissection he had significant residual cognitive deficits and impairments.

14.     In addition to cognitive deficits and impairments, Mr. Lobb suffered from depression, anxiety, migraine headaches, physical and mental fatigue, as well as other physical and mental impairments.

15.     Mr. Lobb also had behavioral changes as a result of the carotid artery dissection.

16.     Mr. Lobb returned to work after his carotid artery dissection.

17.     A neuropsychological consultation was done in April 2020 by Dr. Robert Roth, a board certified clinical psychologist, found that Mr. Lobb's history was consistent with significant emotional, behavioral, and somatic changes that developed after a right carotid artery dissection.

18.     Another neuropsychological evaluation was done by Dr. Roth in July 2020, at which time Dr. Roth did extensive testing and found that Mr. Lobb had intact, and often well above average, cognitive function in many areas but that Mr. Lobb had a significant relative decline in certain areas, including basic auditory attention and variable working memory.

19.     The areas that showed significant relative decline are areas consistent with Mr. Lobb's complaints of cognitive difficulties.

20.     The areas that the neuropsychological evaluation showed significant relative decline were areas which involved material and substantial duties of Mr. Lobb's job at Dartmouth College.

21.     In September 2020, Mr. Lobb began treatment with Dr. Alexandra Stark, a neurologist, because of increasing difficulties, including inability to carry out tasks with three steps, inability to remember how he'd gotten to work and what he had done for the

3

day, problems with multitasking, mental math, and keeping track of lists and calendars, with spatial planning and other basic work duties.

22.     Mr. Lobb had daily headaches with severe headaches about once a week and he would become fatigued after any exertion, mental or physical, of more than 30 minutes.

23.     Mr. Lobb stopped working on September 4, 2020, due to his cognitive difficulties completing work tasks.

24.     Mr. Lobb applied to Lincoln for short term disability.

25.     Lincoln found that Mr. Lobb was unable to perform the Material and Substantial duties of his job, found him disabled, and paid him short term disability benefits through March 3, 2021.

26.     Mr. Lobb underwent a number of neuropsychological evaluations between April 2020 and December 2021.

27.     In January 2021 Mr. Lobb underwent a cognitive functional capacity evaluation (FCE) which showed deficits in focused attention, visual selective attention, and delayed attention. The therapist concluded that "when considering the high level of performance required for his prior work at Dartmouth College this myriad of minor deficits can be a barrier to successfully completing his job roles."

28.     The cognitive FCE also concluded that in any other employment Mr. Lobb will need continued intermittent supervision to ensure his quality of work and that extensive reading or high level of visual detail should not be an essential job function.

29.     Mr. Lobb applied for LTD benefits to begin when his short-term disability benefits ended in March 2021.

4

30.    Mr. Lobb was also attended and treated by Nurse Kate Wageman APRN and Nurse Shannon Seney APRN along with Dr. Stark at the Neurology department at Dartmouth-Hitchcock Medical Center.

31.    In February 2021 Nurse Kate Wageman told Lincoln that Mr. Lobb's coronary artery disease was compounded by a history of migraines which led to some significant cognitive issues, major fatigue, and nearly intractable headaches. She told Lincoln that she did not believe that Mr. Lobb was able to work a job at the same level of capacity in which he was previously employed.

32.    In March 2021 Dr. Stark told Lincoln that Mr. Lobb's diagnosis was traumatic brain injury and that neuropsychological testing showed a decline in cognitive abilities.

33.    Lincoln sought medical assessments from non-examining reviewers Dr. Young, a psychiatrist, and Dr. Taylor, a neuropsychologist.

34.    Dr. Young felt that Mr. Lobb's medical condition met the DSM-5 criteria for a major depressive disorder and that while Mr. Lobb may not be entirely symptoms-free the presence of residual depressive (or anxiety) symptoms does not *per se* imply impairment.

35.    Dr. Taylor felt that, from a neuropsychological perspective, available records do not provide clear, compelling evidence of functional limitations in work or non-work activities due to neurocognitive impairment or psychological symptomatology that would preclude Mr. Lobb from return to work full time in his own occupation.

36. Dr. Taylor stated that he did not agree with Dr. Roth's finding that some test results on his neuropsychological testing were indicative of a 'relative decline' in Mr. Lobb's cognitive abilities.

37. Under the provisions of the Policy

Lincoln, at its own expense, may have the right and opportunity to have Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Lincoln.  This right may be used as often as reasonably required.

38. Neither Dr. Young nor Dr. Taylor examined Mr. Lobb or tested his cognitive or mental health impairments.

39. Lincoln never had Mr. Lobb examined and never obtained any testing of Mr. Lobb's cognitive abilities.

40. Lincoln denied Mr. Lobb's application for LTD benefits by letter dated April 2, 2021.

41. Mr. Lobb appealed Lincoln's denial of LTD benefits.

42. As of June 2021, it was noted that Mr. Lobb sees a total of 12 highly specialized neurologists along with a neurosurgeon and a vascular surgeon.

43. None of Mr. Lobb's treating sources expressed any reservations about the validity or reliability of Mr. Lobb's complaints of cognitive impairments and/or other impairments and difficulties.

44. All of Mr. Lobb's treating source were able to assess the combined effect of Mr. Lobb's impairments on his ability to sustain work-related activities.

45. None of Lincoln's non-examining reviewers were able to assess the combined effect of Mr. Lobb's impairments on his ability to sustain work-related activities.

6

46.    In September 2021 Dr. Nathan Haskell Psy.D., Mr. Lobb's treating psychologist, opined that Mr. Lobb meets the diagnostic criteria for 2 psychiatric diagnoses; major neurocognitive disorder due to another medical condition and persistent depressive disorder.  Dr. Haskell stated that ongoing clinical observations and review of two neuropsychological evaluations corroborated that Mr. Lobb has an inability to sustain focus and concentration, that his cognitive and physical stamina are much diminished from previous functioning, and that his diminution is aggravated by stress, which can lead to unexpectantly being unable to complete tasks which he initiated.

47.    Nurse Shaun Demers, who treated Mr. Lobb for mental health symptoms since March 2021, opined that, based on Mr. Lobb's symptom profile and history, he would not be able to maintain a normal work schedule even in a part time fashion because Mr. Lobb's memory continues to be poor and he continues to be very easily overwhelmed.

48.    Nurse Demers also opined that a return to work at this time would most certainly result in increased emotional dysregulation including relapse of severe depression, anxiety and overall decline of his mental health.

49.    In September 2021, Nurse Seney, who works with Dr. Stark at the neurology department at DHMC, provided a Medical Source Statement in which she opined, *inter alia.*, that Mr. Lobb had deficits in focused attention, visual selective attention and delayed memory, that he had residual symptoms of cognitive fatigue, easily provoked anxiety/frustration, word retrieval difficulty, headaches, and distractibility; that he would be off task more than 20% of the time and would not able to

7

perform under stress.  Nurse Seney stated that Mr. Lobb's cognitive complaints were supported by objective testing and were similar to patients who suffer traumatic brain injury.

50.     Dr. Stark agreed with the opinions that Nurse Seney submitted.

51.     Nurse Wageman, another one of Mr. Lobb's treatment team in the neurology department, completed a Medical Source Statement in September in which she opined, *inter alia.,* that Mr. Lobb's "impairments make work completely infeasible", that "stress and exertion precipitate and exacerbate migraine" headaches, and that "he is no longer capable of working at the level he was previously employed."

52.     Lincoln again sought non-examining reviews of Mr. Lobb's medical condition from Exam Coordinators Network (ECN), a company that provides medical assessments to insurance companies, and other entities, for a fee.

53.     Dr. Selkirk, a neurologist and a non-examining reviewer from ECN, diagnosed a major depressive disorder but felt that Mr. Lobb did not have any restrictions or limitations.  He did not find any neurologic impairments.

54.     Another non-examining reviewer from ECN, Dr. Gordon, a psychologist, felt that there were no restrictions and limitations.

55.     The non-examining reviewer findings were sent to Mr. Lobb's treating sources for comment on their assessments of no restrictions and limitations.

56.     Each of Mr. Lobb's treating sources, to whom the non-examining reviewers sent their findings, disagreed with the non-examining reviewer findings.

57.     In November 2021, Mr. Lobb's condition and testing was reviewed by a multidisciplinary team at Dartmouth Hitchcock Medical Center Neurology at which time it

was agreed that Mr. Lobb had diffuse cerebellar hypometabolism of unclear etiology and Dr. Roth, who performed a number of neuropsychological evaluations, suggested that Mr. Lobb could have a very early prodromal frontotemporal dementia.

57.     Dr. Stark, Mr. Lobb's treating neurologist, diagnosed frontotemporal dementia syndrome.

58.     In addition to the cognitive impairment, Mr. Lobb also suffered from severe chronic migraine headaches.

59.     In November 2021 Dr. Stark submitted a Medical Source Statement regarding Mr. Lobb's medical condition.  In that report Dr. Stark opined that Mr. Lobb has frontotemporal dementia syndrome and that she has no reason to believe that Mr. Lobb did not or could not have experienced the symptoms he reported.

60.     Dr. Stark also opined that quality control standards, production quotes, deadlines, frequent contact with the public, and learning or adapting to new job tasks all would have an adverse effect on Mr. Lobb's medical condition or exacerbate his symptoms.

61.     In November 2021 Dr. Haskell also submitted a Medical Source Statement in which stated that he had no reason to believe that Mr. Lobb did not or could not have experienced the symptoms he reported.

62.     Dr. Haskell opined that depression and anxiety symptoms do not seem to cause or contribute to Mr. Lobb's limitations but they would likely be exacerbated by the stress of attempting to return to work that his limitations now prevent him from being able to perform.

63.     Dr. Haskell opined that quality control standards, production quotes, deadlines, frequent contact with the public, and learning or adapting to new job tasks all would have an adverse effect on his medical condition or exacerbate his symptoms

64.     In December 2021 Mr. Lobb underwent another neuropsychological evaluation, this time by Dr. Moncrief.

65.     Dr. Moncrief's findings showed a pattern of findings which indicated difficulties with attention and variable (but often slow) processing speed within the context of a generally intact cognitive profile.

66.     In December 2021 Mr. Lobb was seen at the Dartmouth-Hitchcock Medical Center Headaches Clinic by Drs. Odermann and Tepper.

67.     The report of Drs. Odermann and Tepper found that Mr. Lobb met the FDA criteria for chronic migraine headaches and that Mr. Lobb's severe headaches were reduced but that he still has daily headaches and that he was severely disabled.

68.     Lincoln's non-examining reviewer Dr. Selkirk said that the additional medical evidence did not alter his opinion that Mr. Lobb did not have any significant neurologic examination findings.

69.     Lincoln's non-examining reviewer Dr. Gordon thought that Dr. Moncrief's neuropsychological testing did not have appropriate validity testing.

70.     Mr. Lobb's necessary medical appointments and testing required work absences greater than would be tolerated.

71.     Lincoln did not consider the amount of work absences that Mr. Lobb would experience from medical appointments alone.

72.    Mr. Lobb's treating sources all found that Mr. Lobb had significant fatigue and lack of stamina after performed minimal physical or mental tasks.

73.    Nurse Kate Wageman opined that Mr. Lobb would not be able to sustain work activity for more than 2-4 hours on the first day and then be non-functional for the next 3-4 days due to his traumatic brain injury.

74.    None of Lincoln's non-examining reviewers assessed Mr. Lobb's lack of stamina or fatigue.

75.    Mr. Lobb's lack of stamina or fatigue would preclude work at his prior employment or any other employment.

76.    The medical records show no suggestion that Mr. Lobb is a malingerer or that he did not give his best efforts on any of the testing.

77.    Lincoln failed to consider the combined effect of Mr. Lobb's impairments on his ability to perform his prior employment.

78.    Mr. Lobb submitted satisfactory evidence to support his disability claim.

79.    Lincoln's denial of LTD benefits was arbitrary and capricious.

80.    Mr. Lobb is disabled within Lincoln's definition of disability.

81.    Mr. Lobb is entitled to monthly disability benefits, monthly special retirement benefits, paid life insurance premiums, and other benefits under the Policy.

81.    Mr. Lobb is entitled to all benefits provided under the Policy, including but not limited to, payment of premiums on life insurance, retirement benefits, and health insurance.

82.    Mr. Lobb was disabled at all relevant times and continues to be disabled within The Lincoln's definition.

83.     Lincoln committed numerous errors in its handling of Mr. Lobb's LTD claim.

84.     Lincoln both determined eligibility for LTD benefits and paid those benefits from its funds and, as such, had an inherent conflict of interest.

85.     Mr. Lobb exhausted all of his administrative remedies.

WHEREFORE, Mr. Lobb demands relief from Defendant Lincoln as follows:

a.      a determination that Mr. Lobb is disabled within the meaning of the policy and is entitled to LTD benefits, including monthly benefits, waiver of premium on the group life insurance policy, retirement benefits, and other benefits offered under the Policy, and

b.      Payment of all LTD benefits withheld, and

c.      Continued payment of LTD benefits, and

d.      Continued waiver of premium on the group life insurance policy and payment of retirement benefits, and

e.      Interest on all benefits withheld by Lincoln at the statutory rate;

f.      Attorney's fees and costs and expenses of litigation;

g.      Any other relief to which Mr. Lobb may be entitled.

Dated in the District of Vermont, this 18th day of November 2022.

ANO LOBB

By      Arthur P. Anderson, Esq
        Anderson Lamb & Associates  PC
        255 S. Champlain St
        P.O. Box 1624
        Burlington, VT 05402-1624